UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **NEW ORLEANS EMPLOYERS INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO PENSION FUND ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 22-2566** |
| **UNITED STEVEDORING OF AMERICA, INC. ET AL** | **SECTION "B"(1)** |

## ORDER AND REASONS

Before the Court are parties' competing motions for summary judgment including plaintiffs' motion for summary judgment (Rec. Doc. 47), defendants' opposition (Rec. Doc. 62), and plaintiffs' reply (Rec. Doc. 65), as well as defendants' motion for summary judgment (Rec. Doc. 51), plaintiffs' opposition (Rec. Doc. 60), and defendants' reply (Rec. Doc. 69). For the following reasons,

**IT IS HEREBY ORDERED** that plaintiffs' motion for summary judgment (Rec. Doc. 47) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment (Rec. Doc. 51) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiffs shall file a motion to obtain additional relief due for unpaid withdrawal liability, pursuant to 29 U.S.C. § 1132(g)(2), **no later than November 17, 2023** and notice same for hearing per Local Rules. Failure to so move will result in the Court's issuance of a final judgment based on the calculations presently before us.

I. **FACTS AND PROCEDURAL HISTORY**

In August 2022, plaintiffs New Orleans Employers International Longshoremen's Association, AFL-CIO Pension Fund and its administrator Thomas R. Daniel filed their

1

withdrawal liability complaint, pursuant to the civil-enforcement instructions in ERISA. Rec. Doc. 1. Plaintiffs claim that $2,833,389.00 is owed by defendants due to their complete withdrawal from the plaintiffs-administered pension fund in March of 2021. *Id.* at 1. United Stevedoring of America, Inc. (a Florida corporation) and American Guard Services, Inc. (a California corporation) allegedly share a principal business establishment at 2475 Canal Street #211, New Orleans, LA 70119. *Id.* at 3. Plaintiffs believe common ownership and control exist in the two corporations, so as to constitute a "controlled group" and open defendants to single-employer treatment for withdrawal liability. *Id*.

In 2016, plaintiffs and United Stevedoring of America, Inc. ("USA") entered a memorandum of agreement, detailing fund benefits provided by plaintiffs and employer contributions supplied by USA. *Id.* at 4. USA remained current on its payments until March 2020, when its cruise ship-services business was suspended due to COVID-19. *Id.* A year later, in March 2021, USA's stevedoring contract was terminated, at which time it allegedly effected a complete withdrawal from the pension fund. *Id.*

Plaintiffs noticed USA of its $2,833,389 withdrawal assessment and demanded payment on February 1, 2022, beginning a sixty-day deadline for USA to provide an initial installment. *Id.* at 5. After USA made a verbal request for additional information, plaintiffs provided a "Formal Response to the Request for Additional Information/Administrative Review" on April 12, 2022, beginning a separate sixty-day deadline for either party to initiate arbitration on the claim. *Id*. When the time for the initial payment expired, plaintiffs informed USA of its need to cure its default within sixty days. *Id.* at 6. Indisputably, no withdrawal-liability payment was ever made. *Id*.

Defendants, however, have challenged whether arbitration was ever initiated. *See* Rec. Doc. 32. Their motion to compel arbitration arrived at the court over a year after the federal proceedings began. The later-in-time motion also contradicted defendants' previous pleadings. In their joint answer, USA and American Guard Services, Inc. ("AGS") both acknowledge the Court's proper jurisdiction through ERISA and "admit that it [sic] has not sought arbitration and that 29 U.S.C. § 1401 speaks for itself." Rec. Doc. 10 at 3, 5. Nonetheless, defendants also claimed as one of their twenty-four affirmative defenses that "Plaintiffs' claims are barred, in whole or in part, for failure to exhaust all administrative remedies." *Id.* at 6.

Over eight months after the complaint and four months after the initial scheduling order, defendants' counsel filed a motion to withdraw. Rec. Doc. 19. Plaintiffs offered no opposition to a trial continuance due to the enrollment of new counsel, Rec. Doc. 24 at 2, and the Court so ordered, Rec. Doc. 25. Since the new scheduling order, however, discovery between the parties has progressed slowly, as evidenced by Magistrate Judge van Meerveld's grant of plaintiffs' motion to compel substantive responses from the defendants. Rec. Doc. 40. Apparently, defendants' discovery delays were driven by their belief that arbitration controlled the complaint. *See* Rec. Doc. 28-7 at 1 ("General Objection. Defendants object generally to participation in discovery herein as premature because applicable law requires that pension withdrawal liability issues 'shall' be subject to arbitration and defendants do not waive arbitration and have demanded and initiated same."); Rec. Doc. 28-8 (same). During this time, defendants filed for arbitration through the American Arbitration Association. Rec. Doc. 32-4 (June 14, 2023). This Court previously denied defendants' motion to compel arbitration. Their competing motions for summary judgment are now before the Court.

## II. LAW AND ANALYSIS

### A. Motion for Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As such, the court should view all facts and evidence in the light most favorable to the non-moving party, without "making credibility determinations or weighing the evidence." *United Fire & Cas. Co. v. Hixon Bros. Inc.*, 453 F.3d 283, 285 (5th Cir. 2006); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

When the movant bears the burden of proof, it must "demonstrate the absence of a genuine issue of material fact" using competent summary judgment evidence. *Celotex*, 477 U.S. at 323. However, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). Should the movant meet its burden, the burden shifts to the non-movant, who must show by "competent summary judgment evidence" that there is a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Lindsey*, 16 F.3d at 618. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *See Sec. & Exch. Comm'n v. Arcturus Corp.*, 928 F.3d 400, 409 (5th Cir. 2019) (citation and internal quotation omitted). On competing motions for summary judgment the court "review[s] each party's motion independently, viewing

the evidence and inferences in the light most favorable to the nonmoving party." *Texas v. Rettig*, 987 F.3d 518, 526 (5th Cir. 2021) (citation omitted).

### B.  Plaintiffs' Motion for Summary Judgment

Plaintiffs filed their motion for summary judgment on September 26, 2023. Rec. Doc. 47. As plaintiffs are the movants and bear the burden of proof at trial, they must "demonstrate the absence of a genuine issue of material fact," entitling a judgment as a matter of law as to their claim of ERISA withdrawal liability. Fed. R. Civ. P. 56(c). As defendants USA and AGS are the non-movants, all facts and evidence are viewed in the light most favorable to them, and should plaintiffs meet their burden, defendants "must then come forward and establish the specific material facts in dispute." *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839 (5th Cir. 2012). To the extent parties' filings related to defendants' motion for summary judgment support their arguments, the Court considers them here with the burden and inferences as described above.

#### a.  Withdrawal Liability Calculation

Plaintiffs' action for withdrawal liability is brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.* When an employer withdraws from pension plan obligations, it is liable for "the allocable amount of unfunded vested benefits." 29 U.S.C. § 1381(b)(1). Here, if withdrawal liability attaches, it does so from March 2021, when USA's contract was terminated and the company made a complete withdrawal. *See* Rec. Doc. 62-1 at 3–4 (defendants' admitting "[i]n March 2021, Carnival Cruise Lines terminated its stevedoring contract with USA and awarded it to another company (Ceres), resulting in USA's obligation to make collectively bargained contributions to the Pension Fund to cease").

5

Matters associated with this withdrawal liability—such as whether a withdrawal has occurred and what the proper amount of liability is—are resolved through arbitration. 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this chapter shall be resolved through arbitration."). The statutory text makes clear that beyond-deadline arbitration demands are improper. *Id.* (setting timeline for arbitration demand). ERISA also explains the procedure for withdrawal-liability claims that have not been timely brought to arbitration:

> If no arbitration proceeding has been initiated pursuant to subsection (a), the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor. The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection.

*Id.* § 1401(b)(1).

Further, upon notice of withdrawal liability from the pension plan, an employer must make interim payments pending arbitration of the claim. *See id.* § 1399(c)(2). When such payment is not made and the employer receives written notice of the failure, the employer is in default. *See id.* § 1399(c)(5)(A). "In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." *Id*. When arbitration is not initiated, the pension plan properly brings an action against the employer to a district court for collection of the default amount. *See id*. § 1401(b)(1).

Here, it is uncontested that USA made no interim payment of withdrawal liability after plaintiffs' notice, nor subsequently cured the payment failure. *See* Rec. Doc. 47-38 at 5 (plaintiffs' statement of uncontested material facts) ("USA failed to cure the delinquency by paying the initial assessment by the 60-day deadline, on July 5, 2023."); Rec. Doc. 51-2 at 3 (defendants' statement

of uncontested material facts) ("Plaintiffs defaulted USA."). Previously, the Court determined that defendants also failed to timely initiate arbitration, rejecting their later-in-time request to compel arbitration. Therefore, before the Court are defendants' pension-contribution default and plaintiffs' request for civil enforcement.

As previously noted, ERISA provisions direct a district court's resolution of a defaulted employer that has not initiated arbitration: "[T]he amounts demanded by the plan sponsor under section 1399(b)(1) of this title *shall be due and owing on the schedule set forth by the plan sponsor*." U.S.C. § 1401(b)(1) (emphasis added). By the very language of the statue, therefore, an employer's challenge of the amount of withdrawal liability is effectively waived through its failure to arbitrate.

Although acknowledging the "harsh result," federal courts uniformly agree that failure to raise the defense of withdrawal liability amount in arbitration precludes the raising of the defense at the district court. *See, e.g., Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 850 (7th Cir. 2015) ("The result may be harsh, but the statute embodies a strong public policy that any dispute over withdrawal liability be submitted to arbitration.") (citation omitted, quotation cleaned up); *see also Bd. Of Trs. Sheet Metal Workers' Nat'l Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 376 (4th Cir. 2006) ("[T]he issues [employer] now seeks to raise for the first time in federal court about its withdrawal liability are deemed waived."); *Bd. Of Trs. Of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Kero Leasing Corp.*, 377 F.3d 288, 294 n.5 (3d Cir. 2004); *Mason and Dixon Tank Lines, Inc. v. Cent. States, Se. and Sw. Areas Pension Fund*, 852 F.2d 156, 166, n.11 (6th Cir. 1988); *I.A.M. Nat. Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415, 429 (D.C. Cir. 1987) ("To summarize, we hold that the defenses [employers] sought to raise . . . fall within the ambit of 29 U.S.C. § 1401(a) as issues that should have been submitted to arbitration. Having failed to

7

initiate arbitration, these employers were barred from raising their defenses in collection actions brought by the Fund.").

Unlike sister circuits, the Fifth Circuit has not reached this issue. Recently, however, another section of the Eastern District of Louisiana court addressed the waiver of arbitration defenses in a case implicating both parties present in this litigation. *See New Orleans Emps. Int'l Longshoremen's Assoc., AFL-CIO Pension Fund v. Mar. Sec., Inc.*, No. 17-7430, 2019 WL 342440 (E.D. La. Jan. 28, 2019). As USA's contract predecessor, the *Marine Security* defendant sought to shield itself from withdrawal liability by both contending Carnival Cruise Lines was the true employer and asserting that because USA took over the defendant's contract—including the pension obligations—no harm was suffered by plaintiffs New Orleans Employers International Longshoremen's Association, AFL-CIO Pension Fund, and its administrator Thomas R. Daniel. *Id.* at *2. In granting plaintiffs' and denying defendant's motion for summary judgment, the court acknowledged no definitive Fifth Circuit direction on waiver, but also noted *Tsareff v. ManWeb Services, Inc.* from the Seventh Circuit for the proposition that "that an employer's failure to exhaust via arbitration the issue of withdrawal precludes the employer from raising the issue in district court." *Id.* at *3 (citing *Tsareff*, 794 F.3d at 850). Nonetheless, the district court explored the defendant's arguments on Carnival Cruise Lines and USA's possible relations to the claim, concluding that neither was a viable defense. *See id.* at *3–5. The court did not analyze the amount of withdrawal liability incurred, simply noting, "Defendants do not contest the methodology utilized by Segal to calculate the withdrawal liability or Segal's calculations with respect to the amount of withdrawal liability assessed." *Id.* *2.

Unlike in *Marine Security*, defendants dispute the calculated withdrawal amount. *See* Rec. Doc. 62 at 18. However, in so doing, defendants fail to engage the statutory text, namely, ERISA's

8

provisions on the definition and consequences of default and the plan manager's remedy of civil enforcement. *See* 29 U.S.C. §§ 1399(c)(5)(A), 1401(b)(1). In fact, defendants admit that USA made no interim payment following withdrawal liability notice. *See* Rec. Doc. 62-1 at 6 ("Defendants deny that there was a delinquency but admit that they made no payment within 60 days."). Further, they acknowledge that following the expiration of the period to cure "Plaintiffs defaulted USA." Rec. Doc. 51-2 at 3. As the Court has previously rejected defendants' arbitration arguments, the clear language of ERISA applies. USA is in default due to "the failure of an employer to make, when due, any payment . . . if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure." 29 U.S.C. § 1399(c)(5)(A). USA's default permits plaintiffs to "require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." *Id.* § 1399(c)(5). And with no arbitration proceeding initiated, "the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor." *Id.* § 1401(b)(1). As the United States Court of Appeals for the D.C. Circuit noted over thirty-five years ago, "[A]rbitration reigns supreme under the MPPAA. And the consequences of failing to arbitrate . . . are clearly enunciated by the statute." *I.A.M. Nat. Pension Fund, Plan A v. Clinton Engines Corp.*, 825 F.2d 415, 422 (D.C. Cir. 1987).

### b. Binding Contract

Although the calculation of withdrawal liability follows the clear directives of ERISA, such liability is assessed against defendants only if the CBA binds at the time of withdrawal. Unlike other aspects of ERISA liability, the Fifth Circuit has provided guidance on the possible

prolongment of expired agreements. *See Firesheets v. A.G. Bldg. Specialists, Inc.*, 134 F.3d 729 (5th Cir. 1998).

In *Firesheets*, a pension fund filed suit against an employer for long-delayed pension contributions. *Id.* at 730. Unquestionably, the employer's CBA with its union expired in 1984. *Id.* Although negotiations between parties occurred at that time, no new agreement was confected. *Id*. In its 1995 suit, however, the pension fund claimed that a new CBA—or at least a pension-related agreement—was reached through the employer's conduct during the intervening years. *Id.* at 731. Specifically, the pension fund noted that the employer "continued to make voluntary contributions to the Trust Funds on behalf of some of its employees for approximately ten years after the expiration date of the original Agreement." *Id.* at 730. Although contributions were made, their scope was significantly reduced, with the employer providing contributions for only two employees after 1988 and for only one after 1992. *Id.* The employer contended that the contributions were made at the request of certain employees, not in confirmation of provisions in the expired CBA. *Id.* at 731.

In affirming the lower court's grant of summary judgment to the employer, the Fifth Circuit did not merely look for a mathematical calculation of pre- and post-expiration contributions. More significantly, the appellate court determined that the employer's overall conduct was "not consistent with the formation of an agreement, and [it] has behaved in a manner inconsistent with the original Agreement." *Id*. This evaluation was necessary because circuit precedent held that "adoption of a labor contract is not dependent on the reduction to writing of [the parties'] intention to be bound. Instead what is required is conduct manifesting an intention to abide by the terms of the agreement." *Id.* (quoting *NLRB v. Haberman Construction Co.*, 641 F.2d 351, 355–56 (5th Cir.1981)). The *Firesheets* employer did not manifest such intent to be bound because its hiring,

wage, holiday, and pension practices after the CBA's expiration all deviated from the previous terms. *See id*. Further, these modifications were strictly the employer's decisions, and not based on any interaction with the union. *See id.* at 730. Although the pension fund pointed to language on the few contributions the employer did maintain, the text and limited actions were not enough to reveal an intent to abide by expired terms. *See id.* at 732. Rather, the employer's conduct was "by and large, [] inconsistent with the creation of a new agreement, and the existence of some boilerplate language on the record-keeping documents for the contributions does not bind [the employer]." *Id.*

After discussing *Firesheets*, a fellow Eastern District of Louisiana court similarly concluded that enough inconsistent practice by an employer evidenced a lack of intent to be bound to an expired CBA. *See Millwrights & Mach. Erectors Loc. Union 729 v. Gulf Eng'g Co., LLC*, No. 10-989, 2011 WL 162071 (E.D. La. Jan. 18, 2011). In *Millwrights*, the employer continued to pay the previous wage rate and make pension contributions after the expiration of its agreement with the union, but it also hired union members sparingly, no longer used the union as its bargaining agent, and explicitly rejected subsequent CBA proposals. *Id.* at *5. In finding no post-expiration agreement, the district court only noted "some support" from the consistency of the employer's conduct, insufficient for the prolongation of the previous terms.

Here, on the other hand, no inconsistent conduct by USA is apparent. USA admits that, after the CBA's September 30, 2018 expiration, the pension contribution rate remained consistent and contributions were made through April 2020. *See* Rec. Doc. 62-1 at 3. In fact, although defendants point to the CBA's expiration as their crossing the Rubicon from pension obligations to voluntary contributions, they repeatedly admit that USA's operations changed only with the onset of the COVID-19 pandemic. *See* Rec. Doc. 10 at 8 ("Defendants' operations ceased at

commencement of the Covid pandemic."); Rec. Doc. 51-1 at 2 ("Carnival Cruise Lines terminated its contract with defendant USA for stevedoring services at the Port of New Orleans in March 2021. Carnival ceased operations at the Port of New Orleans (and elsewhere) in March 2020, due to the Covid-19 pandemic."); Rec. Doc. 62 at 2 (same). Defendants provide no evidence of post-expiration inconsistencies. Instead, their argument repeats the claim that plaintiffs must provide another document to substantiate their suit:

> To support the claim for withdrawal liability outlined by the Complaint and repeated in the Motion for Summary Judgment, plaintiffs must be able to point the Court to some other agreement made with defendant USA pursuant to which USA agreed to participate in and contribute benefits to the pension plan after September 30, 2018, and pursuant to which the plaintiffs were granted the right to collect withdrawal liability.

Rec. Doc. 62 at 10. To support this conclusion, defendants insist "the case law is abundantly clear that merely continuing to make benefits contributions is not a substitute for an active, governing collective bargaining agreement as a means for imposing withdrawal liability." *Id.* at 9. However, as discussed above, neither *Firesheets* nor its application in *Millwrights* stands for this point of law. The unquestioned consistency of conduct by USA after the agreement's expiration indicates the employer's intent to remain bound by the CBA provisions. Thus, USA's pension obligation remained at the time of its complete withdrawal from the plan. As such, other arguments related to the National Labor Relations Act are unnecessary to analyze.

### c. Controlled Group Liability

Finally, with USA bound by its pension obligations at the time of its complete withdrawal, Pension Fund pushes further to find AGS as a member of the "controlled group," and thereby jointly and severally liable. *See* 29 U.S.C. § 1301(b)(1); *Cent. States, Se. & Sw. Areas Pension Fund v. Creative Dev. Co.*, 232 F.3d 406, 409 (5th Cir. 2000) (noting that controlled group members "are treated as a single employer . . . [and] are jointly and severally (solidarily) liable for

the withdrawal liability incurred by any member of the controlled group"). Although there are various means by which to demonstrate overlapping control (and liability) between companies, ERISA's provisions provide straightforward reference to the controlled group definitions of the Treasury Department:

> [A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

29 U.S.C. § 1301(b)(1). Among the Treasury Department's definitions of controlled groups, "brother-sister" businesses exist when

> (i) the same five or fewer persons who are individuals, estates, or trusts own . . . a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.

26 C.F.R. § 1.414(c)–2(c)(1). In turn, a "controlling interest" is present where there is "ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation," and "effective control" where five or fewer persons "own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of such corporation." *Id.* §§ 1.414(c)–2(b)(2)(i)(A), 1.414(c)–2(c)(2)(i).

Here, corporations USA and AGS dispute that they form a brother-sister controlled group. Without engaging the ERISA statutes or the Treasury Department's controlled group provisions, defendants acknowledge that "AGS and USA were at one time held jointly . . . by Sherine and Sherif Assal, but as Sherine testified and Sherif acknowledged, Sherif's share in AGS was

13

terminated in 2021 in exchange for debt forgiveness." Rec. Doc. 62 at 4. As evidence of the split in ownership, defendants reference Sherine's deposition:

> A. We decided at the end of 2021, but we had already filed taxes for 2021, or we were filing taxes. So it was at the end of 2021 that we decided that Sherif would take [USA] over.
> Q. Was this the same time that you became a hundred percent owner in American Guard Services?
> A. Correct.

Rec. Doc. 62-4 at 15. Despite Sherine's statements, however, USA and AGS's tax returns signed in October 2022 for the 2021 calendar year continue to list ownership as shared between Sherine and Sherif. *See* Rec. Doc. 47-25 at 1, 3–4 (tax return signed October 17, 2022 listing USA ownership interests as Sherine 50%, Sherif 50%); Rec. Doc. 47-26 at 1, 6–7 (tax return signed October 24, 2022 listing AGS ownership interests as Sherine 51%, Sherif 49%). Defendants even point to 2017 as Sherif's "initial separation from AGS." Rec. Doc. 62 at 5. "Any confusion caused by inaccurate business descriptions" on the later tax documents, moreover, "was simply error and was addressed and contested by Sherine in her deposition testimony and confirmed by the company's accountant." *Id.*

However, the referenced evidence of "error" does not support defendants' contentions. Sherine's deposition merely restates the shared ownership percentages until the end of 2021 at the earliest. *See* Rec. Doc. 62-4 at 21. And the affidavit of accountant Mohamed Hegazy only confirms that he prepared the USA tax documents. *See* Rec. Doc. 62-8 at 1. No evidence substantiates defendants' simple-error argument.

Furthermore, the relevant date of ownership interest is March 2021, when USA's contract was terminated, and it made a complete withdrawal. *See* Rec. Doc. 62-1 at 3–4 (defendants' admitting "[i]n March 2021, Carnival Cruise Lines terminated its stevedoring contract with USA and awarded it to another company (Ceres), resulting in USA's obligation to make collectively

bargained contributions to the Pension Fund to cease"). Sherine's deposition testimony does not contradict shared ownership in March 2021. *See* Rec. Doc. 62-4 at 15 ("We decided at the end of 2021."). Therefore, at the time of the complete withdrawal, Sherine and Sherif had a 100% controlling interest between USA and AGS, and a 99% effective control. *See* Rec. Doc. 47-25 at 1, 3–4 (USA ownership interests Sherine 50%, Sherif 50%); Rec. Doc. 47-26 at 1, 6–7 (AGS ownership interests Sherine 51%, Sherif 49%). Both percentages exceed the Treasury Department's requirements for a brother-sister controlled group. *See* 26 C.F.R. § 1.414(c)–2(c)(1). Therefore, USA and AGS are controlled group members, jointly and severally liable for withdrawal liability. It is unnecessary to reach plaintiffs' single-employer and alter-ego arguments.

As such, all aspects of plaintiffs' motion for summary judgment show no genuine issue of material fact. Plaintiffs are due judgment as a matter of law.

A. **Defendants' Motion for Summary Judgment**

Having found that plaintiffs are entitled to summary judgment as a matter of law, defendants' motion for summary judgment is **DENIED** for the reasons stated above. To the extent that defendants' motion for summary judgment (Rec. Doc. 51) and their reply memorandum to plaintiffs' opposition (Rec. Doc. 69) raise additional arguments other than those raised in defendants' opposition to defendant's motion for summary judgment (Rec. Doc. 62), the Court rejects these arguments, as defendants provide no additional evidence that the Court has not already taken into consideration in ruling on defendant's motion for summary judgment.

New Orleans, Louisiana this 8th day of November, 2023

_____
SENIOR UNITED STATES DISTRICT JUDGE